Filed 11/18/22  In re T.C. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re T.C. et al., Persons Coming Under the Juvenile Court Law. | B317488 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>T.C.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 18LJJP00463A, 18LJJP00463B, 18LJJP00463C) |

APPEAL from orders of the Superior Court of Los Angeles County, Susan Ser, Judge.  Affirmed.

Jill S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

Mother appeals the juvenile court's orders summarily denying her petition to change court orders under Welfare and Institutions Code section 388,[1] and denying her request for a bonding study. Finding no abuse of discretion, we affirm.

## BACKGROUND

*Family background and history*

The family consists of mother, father, and three children: minor (born July 2013), the middle child (born December 2015), and the youngest child (born October 2017).[2] From 2014 to 2016, minor was the subject of a prior child welfare case in Nevada, based on the parents' domestic violence. While the Nevada case was pending, minor lived with T.B. (foster mother) and her husband (collectively, foster parents) for 17 months, after which

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The two younger children may have different last names from minor, but in this opinion we will simply refer to them by their birth order. Father is the presumed father of all three children. Father and all three children are not parties in this appeal.

2

minor returned to her parents' custody.[3]  Even after the Nevada case closed, the foster parents remained in contact with minor's paternal grandparents and continued to see minor periodically. The parents dropped off minor at the foster parents' home for two months in 2017.  When mother picked minor up with no notice, and seemed unprepared to care for minor, foster mother called a Nevada hotline.  A different referral against mother in California in 2017 alleged general neglect, but the referral was closed when the agency was unable to locate mother.

*Initial investigation*

The Department investigated the family in early July 2018, interviewing foster mother and paternal grandparents, all of whom reported that mother was unstable and unable to care for the three children.  They expressed concern that mother was violent and abusive, but also that the family might flee to evade investigation.  Mother communicated with the social worker, but denied any prior arrests or child welfare cases, and answered most questions in a defensive and evasive manner.  Because mother refused to allow the social worker to interview minor alone, minor's interview was conducted in mother's presence. Minor reported being fed and denied witnessing violence, but she

---

[3] The foster parents have been in communication with the Los Angeles County Department of Children and Family Services (Department) from the beginning of the Department's investigation and continuing into the current case.  The children were not placed with foster parents in the current case until 2020, after approval under the Interstate Compact on the Placement of Children (ICPC).

appeared hesitant and would look at mother when answering. When the social worker tried to coordinate with mother to bring the youngest child in for a follow-up X-ray to determine whether he had a skull fracture or a congenital issue, mother continued to be evasive, giving only vague answers to questions about where the family was staying and stating she would take the youngest child to see a doctor, but not giving any detail about the doctor.

*Children are detained, mother does not participate in reunification services*

On July 18, 2018, the Department located the family, took the children into protective custody, and transported them to the paternal grandparents' home. At that time, the youngest child was nine months old, the middle child was two and a half years old, and minor was five years old. At the detention hearing, the court ordered referrals and transportation assistance for mother, and nine hours per week of monitored visits, with discretion granted to the Department to liberalize visitation.

Although it is not apparent from the record when mother started having monitored visits, or how long they were, she consistently attended visits each week through September 2018. Mother reportedly enrolled in anger intervention services, but the Department never received any proof of enrollment.

At the adjudication hearing in October 2018, the court declared the three children dependents under section 300, subdivision (b), based on inappropriate discipline, failure to provide care and supervision, domestic violence, and father's substance abuse. Mother's case plan included the following: random drug testing upon suspicion; anger management;

parenting classes; mental health counseling, including taking all prescribed medication; and individual counseling to address case issues, including substance abuse, domestic violence, and anger management. Visitation was to be monitored, in a setting approved by the Department. The Department had discretion to liberalize visitation.

Despite having access to weekly monitored visits, mother only attended nine visits with the children during the six-month period from October 2018 to March 2019, with no visits in January or February 2019. The children remained placed with paternal grandparents. On the date of a scheduled visit in late February 2019, mother instead called law enforcement and threatened to go to the paternal grandparents' home. According to the social worker and law enforcement, mother's statements made no sense, and she did not appear to be in a healthy state of mind.

By March 2019, mother had not completed any of her court ordered programs, and she failed to complete on-demand drug testing on four separate dates. She was arrested on December 1, 2018, for being under the influence of a controlled substance. She was arrested again on January 22, 2019 for driving under the influence of alcohol.

After failing to meet with the social worker in April 2019, mother requested a Child and Family Team (CFT) meeting for May 1, 2019. Mother, father, paternal grandparents, minor's wraparound team, and the social workers attended. Mother had not yet started parenting classes or individual counseling, and she failed to submit to an on-demand drug test on the date of the CFT meeting as well as the following day. She claimed a mental health provider had seen her and deemed she was fine, but she

had not provided any documentation to the Department. Mother had also shown up unannounced at minor's school and the younger children's day care; she threatened the paternal grandparents' friends and family, and demanded that the paternal grandparents monitor her visits. In response, the social worker arranged for a third-party monitor, and paternal grandparents agreed to a schedule for mother to have telephone visits with the children. The social worker planned to draft a written agreement for in-person and phone visits for the parties to sign.

After the May 1, 2019 CFT meeting, mother attended only one of seven scheduled in-person visits. At that visit, staff had to redirect mother several times when mother told the children to go to sleep because she was tired. Ultimately, the visit was cut short due to mother's impatience with the children. Mother continued to make unfounded accusations of abuse against the paternal grandparents, causing law enforcement to come to the home twice. Paternal grandmother reported the incidents were causing the children significant emotional trauma. The middle child was unable to sleep because she was scared of being taken away. The Department recommended terminating reunification services for both parents.[4]

---

[4] Father's visitation and participation in services also dropped dramatically. Mother left a voicemail for paternal grandfather reporting that father had been with her since the CFT, and was running with the wrong crowd. In May and June 2019, father only visited the children twice, staying no longer than 20 minutes. Father reported he was working at FedEx, and his job required him to be away five to seven days at a time.

*Mother's reunification services terminated; the Department*
*prepares to place the children with foster parents in Nevada*

At the six-month review hearing on July 1, 2019, the court terminated mother's reunification services, and ordered the Department to initiate the process for placement with foster mother under the ICPC.

Between July 2019 through January 2020, mother had no contact with the children; she was incarcerated for a portion of that time. She was arrested twice in early August 2019 in connection with her prior DUI, and again in September 2019 for threatening a crime with intent to terrorize.

By November 2019, foster mother was in the final stages of licensing; she hoped to move the children during winter break so minor could start at her new school at the beginning of the semester. The children visited the foster parents in the fall of 2019, and again over winter break. Foster mother reported receiving a threatening phone call from mother; nevertheless, foster mother was willing to provide permanent placement for the children while maintaining family ties with father and paternal grandparents. On January 29, 2020, the Department reported that foster mother received ICPC approval. On the same day, the court ordered monthly visits for mother, consistent with the rules of her place of incarceration.

The dependency proceedings were continued several times due to the COVID-19 pandemic. There is no evidence in the record that mother participated in any visits (in person or

---

Despite being asked to provide proof of employment, father had not yet provided such proof.

virtually) between January 2020 and November 2020. Sometime between March and November 2020, the children moved from paternal grandparents' home to the foster parents' home, although the record is not clear about precisely when the move took place. By November 2020 the children were living with the foster parents, and were stable and bonded with them.

*Post-reunification period*

In the fall of 2020, mother provided some limited documentation purporting to show she had completed a residential substance abuse treatment program on July 12, 2020 and engaged in other unspecified services. However, it appears from the record that either mother had not signed a release permitting program staff to speak to the social worker, or the program staff did not respond to the social worker's attempts to verify mother's participation and progress.

On Monday, November 9, 2020, mother had her first virtual visit with the children. Moving forward, visits took place on alternating Mondays for a half-hour, monitored by a therapist.

Mother appeared at a scheduled section 366.26 hearing on April 12, 2021, but the court found good cause to continue the hearing to permit the Department to provide proper notice to mother. At the hearing, the court admonished mother to provide the court and the Department with an address within one week. Nevertheless, despite being asked on multiple occasions, mother declined to provide a physical address to the Department, and attempts to identify a valid address for mother proved unsuccessful by May 27, 2021.

A June 2021 report stated that the children were doing well in their placement with foster mother. Foster mother reported that during virtual visits with mother, only minor would be engaged in the visit. The middle child only engaged for a few minutes, and the youngest child would say "hi, mommy" and then turn to other activities.

In early June 2021, foster mother filed a caregiver information form affirming her commitment to providing permanency. She reported that all three children, who were then three and a half, five and a half, and almost eight years old, were thriving, bonded to the foster parents and their extended family, and participating in dance/gymnastics, soccer, or both. Although minor and the middle child initially struggled in a virtual learning environment, they thrived after moving to an in-person learning environment. The youngest child had no memory of his biological mother, as he was removed at the age of eight months, and the middle child knew who her parents were, but had no memories of living with them or being cared for by them. Minor's memories of her biological parents were traumatic, she recalled "homelessness, hunger, physical abuse and neglect along with having to care for her younger siblings when she was only three and four years old."

The social worker observed a video visit between mother and the children, noting that foster mother helped the children interact with mother. Although mother sometimes engaged with minor and the middle child, at other times, mother would just look at the camera and not engage with the children. When minor became upset, mother made no attempt to try to calm her down. Foster mother helped the children interact with mother, prompting them to tell mother about their day or show her

9

things.  In a separate conversation the following day, the foster mother conveyed to the social worker her concerns about the possible impact that in-person visits would have on the children's well-being, since almost two years had passed since mother last saw the children in person.  Foster mother said she would stay to support the children in any way she could, and she would feel more comfortable if there were two people to monitor an in-person visit.

Mother finally provided an address to the Department on June 21, 2021.  When asked if she had any questions or concerns, mother responded, "no."

*Mother's first 388 petition*

Mother filed her first section 388 petition on the day of a scheduled section 366.26 hearing.  The petition only named minor, and did not state that mother was seeking a change of court orders as to the two younger children.  Mother asked for minor to be returned to her custody, or alternatively, for an order reinstating her reunification services, or overnight or unmonitored visits.  Mother listed the following changed circumstances:  she had completed her case plan, including parenting classes; anger management classes; individual counseling to address case issues, substance abuse, and domestic violence; a rehabilitation bridge housing program; an outpatient program; 12-step meetings; random weekly testing; and she maintains weekly contact with the children.  Mother's explanation for why the requested relief would be in minor's best interests stated, "The child has a good relationship with her mother and loves their weekly visits.  As stated in the [section]

10

366.26 Report from June 17, 2021, [minor] engages well with mother during their visits. The child would benefit from continuing the relationship with her mother who can provide her with a loving and caring environment, as well as familial support." The only documentation mother attached to her section 388 petition was her own declaration and a letter from Prototypes program center, stating that mother had entered the center's outpatient behavioral health intensive program on July 31, 2020, transitioned to a moderate level of care on April 15 2021, and then into recovery support services on July 14, 2021. Although the letter from Prototypes explained that the center offered therapy and classes, including classes on relapse prevention, parenting, and life skills, it did not specify whether mother had taken any classes on parenting, anger management, or domestic violence, or if so, how many sessions she attended. Mother's declaration stated she had phone visits instead of in-person visits because the children were placed out of state. Mother asserted that after the court terminated reunification services, she had participated in and completed all court ordered services, and that she had been sober for two years. Mother declared she was seeking to have all three children to be returned to her care, that it would be in their best interests to have her in their lives, and that the children have stated they would like to live with her. The court granted a hearing on mother's section 388 petition and continued the section 366.26 hearing.

The Department filed a response to mother's section 388 petition two days before the scheduled hearing date. Since November 2020, mother had consistently participated in monitored video visits on alternate Mondays for 30 minutes, with minor participating fully, while the younger children were

11

participating to a much lesser extent. Mother did not facilitate the social worker's effort to obtain documentation of mother's program participation, and after initially agreeing to meet with the social worker, mother cancelled the meeting and refused to speak to the social worker. The Department recommended against granting mother's section 388 petition based on the lack of any in-person visits in the past two years, mother's lack of bonding with the children, her lack of insight into why her children were not with her, and her refusal to speak with the social worker.

On the scheduled hearing date, mother withdrew her section 388 petition. She instead requested the court to order in-person visitation with a written visitation schedule. Minor's counsel pointed out that mother still needed to be coached and guided to engage with the children during her video visits, and any in-person visits should be in place of the video visits, not in addition. The court ordered that there would be no prohibition against in-person visits, but the parents would have to travel to the children, and the Department would work out a written visitation schedule for mother.

On October 13, 2021, mother started having two-hour, in-person visits, every other week. Mother had to be prompted to redirect the children when they started doing things like standing on tables or chairs, or pulling blinds from the windows.

*Mother's second 388 petition denied without evidentiary hearing*

On November 9, 2021, mother filed a second section 388 petition, seeking a change of court orders for all three children. Mother's allegations of changed circumstances and best interests

were identical to the allegations made in her earlier section 388 petition, and it was supported by the same declaration. The only difference in the supporting documents was that the letter from Prototypes program center reflected that mother had "attended 572.72 hours of outpatient services." Once again, the letter from Prototypes did not specify whether mother had taken any classes on parenting, anger management, or domestic violence.

A visit on November 17, 2021, was ended early because mother was just sitting there and not engaging with the children. After the visit ended, mother remained in the parking lot, so foster mother had to be escorted to her car. Foster mother did not trust mother; she believed mother would disappear with the children, having shown similar inclinations in the past. Minor's second grade teacher reported a change after mother started having in-person visits. Prior to the visits with mother, minor had been confident and engaged with class, but after November 8, 2021, T.C's grades had dropped and she would cry often, provoke her peers, and become defiant. Foster mother said minor's grades dropped from A's and B's to C's and D's, and foster mother was concerned minor might get kicked out of the private school. By December 2021, the children were thriving in the foster parents' care, and the Department recommended terminating parental rights and proceeding with adoption.

On December 6, 2021, the parties presented argument on whether the court should schedule an evidentiary hearing on mother's section 388 petition. The Department argued the court should deny mother's petition without a hearing because even if she could show changed circumstances, mother could not make a prima facie case that granting the petition would be in the best interests of the children. The children had been out of mother's

13

care for over three years, first with paternal grandparents and most recently with foster parents.  The middle and youngest children had not lived with mother since they were infants; they had no memory of her, and mother's visits were inconsistent.  Mother's counsel emphasized that there was no evidence mother had been unsafe or inappropriate during virtual visits, and that while the middle child's participation in virtual visits was less than minor's, the two children were vying for mother's attention, demonstrating that they want some sort of relationship with mother.  Counsel's argument did not address mother's conduct at the in-person visits.  In response to a question from the court about when mother's alternate week visits became regular, counsel conveyed mother's statement that her visits have always been regular.  Minor's counsel argued mother had not made a prima facie case of either a change in circumstances or minors' best interests.  On changed circumstances, there had been no drug tests for the past year, since November 2020, and mother had provided no information about her current housing situation.  On the relationship between mother and the children, the therapist recommended supervised visits, and during in-person visits, staff had to intervene because mother would not redirect the children when they misbehaved.

At the end of argument on the question of whether to hold an evidentiary hearing on mother's section 388 petition, the court asked the Department and mother's counsel whether they were ready to proceed with mother's testimony on both mother's section 388 and her contested section 366.26 hearing.  Mother's counsel responded that he wanted to request a bonding study; he also requested the opportunity to respond to the arguments on mother's section 388 petition.  The Department and minor's

14

counsel favored proceeding with the contested section 366.26 hearing, and the Department objected to mother's request for a bonding study.  Minor's counsel reminded the court that the children had been in placement since 2018, and with several continuances already, the court needed to resolve permanency.  Father's counsel joined mother in requesting a later date for a contested hearing, as father was not available to testify.  Returning to the question of mother's section 388 petition, mother's counsel argued that he should not have to respond to information contained in the Department's section 388 response, because the current hearing was only to decide whether an evidentiary hearing on mother's section 388 was needed, and the statements in mother's petition, if taken as true, made a prima facie case for relief.

The court denied mother's section 388 petition, noting the recency of mother's efforts to visit the children, her lack of cooperation with the Department's efforts to interview her, and the children's stability in their current placement.  Next, the court set a new date for the contested section 366.26 hearing, to give mother and father the opportunity to testify.  Over mother's objection, the court denied her request for a bonding study, and mother reiterated her objection to the court's decision to deny the section 388 petition without an evidentiary hearing.

## DISCUSSION

*Summary denial of mother's section 388 petition*

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the

15

child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  " 'The burden thereafter is on the parent to prove changed circumstances pursuant to section 388 to revive the reunification issue.  Section 388 provides the "escape mechanism" that . . . must be built into the process to allow the court to consider new information.' " (*In re Zacharia D.* (1993) 6 Cal.4th 435, 447.)  "Even after the focus has shifted from reunification, the scheme provides a means for the court to address a legitimate change of circumstances while protecting the child's need for prompt resolution of [the child's] custody status." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  Thus, "after reunification services have terminated, a parent's [section 388] petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

The juvenile court is not required to hold a full hearing on a section 388 petition.  "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.  [Citation.]'  [Citations.]  There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.  [Citation.]  If the liberally construed allegations of the petition do not show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)  "In determining whether a parent has made a prima facie showing under section

16

388, we may consider the entire factual and procedural history of the case." (*In re Daniel F.* (2021) 64 Cal.App.5th 701, 711.) " '[G]eneral, conclusory allegations' " are insufficient to make a prima facie showing. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7 (*Samuel A.*).)

In determining minors' best interests, a court examines: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

We review the summary denial of a section 388 petition for an abuse of discretion. (*Samuel A.*, *supra*, 55 Cal.App.5th at p. 7; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

Viewed in the context of the "entire factual and procedural history of the case" (*In re Daniel F.*, *supra*, 64 Cal.App.5th at p. 711), the juvenile court did not abuse its discretion in summarily denying mother's section 388 petition. The children were very young in July 2018 when they were initially detained from their parents' custody and placed with paternal grandparents. Minor was five years old, but had already spent over a year and a half of her life with foster parents, who had continued to maintain a relationship with the child and her

17

paternal grandparents.  Mother's visits were few and far between until she started virtual visits over two years later, in November 2020.  Mother attested she had completed all court ordered services, but her section 388 petition lacked any factual allegations addressing the extent to which mother understood the seriousness of the problems which led to the dependency or the degree to which her participation in services had removed or ameliorated those problems.  Mother's petition also made no mention of the relative strength of the children's bonds to mother as compared to the foster parents with whom they had been living for at least the past year.

In addition, while the court had granted mother a hearing on the first section 388 petition she filed in August 2021, a date that had been scheduled for a section 366.26 hearing, on the September 2021 date set for the section 388 hearing, mother withdrew her petition, instead requesting in-person visitation. Despite the juvenile court having granted the in-person visits, when mother filed her second section 388 petition, she did not make any changes to the prior petition or provide any additional reasons to grant the new petition.  Instead, in her explanation for why the court should change the July 1, 2019 order terminating reunification services, mother merely made vague and conclusory assertions that the children would benefit from a continued relationship with their mother, who could provide them with "a loving and caring environment, as well as familial support." Such " 'general, conclusory allegations' " are insufficient to make the prima facie showing necessary for a court avoid summary denial.  (*Samuel A.*, *supra*, 55 Cal.App.5th at p. 7.)

18

*Denial of mother's bonding study request*

Mother contends the juvenile court abused its discretion when it denied her request for a bonding study. She argues that without a bonding study, any future decision on the presence or absence of a bond between mother and her children would be based solely on the observations of the caretaker, rather than a bonding expert. In other words, mother seeks a bonding study to provide support for the application of the parental relationship exception to termination of parental rights.

In the context of dependency proceedings, a bonding study is an expert opinion on the existence and nature of the relationship between a parent and a child (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084) or between siblings (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1011–1012). "A bonding study can be relevant at a hearing under section 366.26 to the question of whether the beneficial parent-child relationship exception should prevent the termination of parental rights. However, '[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to' terminating parental rights." (*In re M.M.* (2022) 81 Cal.App.5th 61, 68–69.) As a general matter, a juvenile court is not required to appoint an expert when making any factual determination unless it determines "expert evidence is or may be required." (Evid. Code, § 730.) Our Supreme Court has recently emphasized that where the termination of parental rights is at issue, "[t]rial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*In re Caden C.* (2021) 11 Cal.5th 614, 633, fn. 4.)

Our review of the juvenile court's denial of a request for a

19

bonding study is for abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341–1342.) Here, we find the juvenile court acted well within its discretion when it concluded a bonding study was not necessary. Mother's in-person visits had only started in mid-October 2021, and by early December 2021, no more than four in-person visits had occurred. Among those few visits, at least one visit was ended early, because mother was not engaging with the children. In addition, the record contained significant information about the adverse impact of mother's visits, from both the children's caretaker and minor's teacher, who reported negative behavioral changes after mother's visits started. Mother's limited visits, considered in the larger context of the children's ages, the lengthy time periods when mother was not visiting at all, and the fact that the case had already been pending for three years, were not enough to warrant the delay that would inevitably accompany a bonding study, particularly given the evidence of the detriment those visits appeared to cause.

## DISPOSITION

The juvenile court's orders denying mother's section 388 petition and her request for a bonding study are affirmed.
NOT TO BE PUBLISHED.


MOOR, J.


We concur:


RUBIN, P. J.


BAKER, J.